MICHELE POWER
SEAN BROWN
WHITNEY POWER
POWER AND BROWN, LLC
P.O. BOX 1809
BETHEL, ALASKA 99559
Telephone: (907) 543-4700
Facsimile: (888) 887-1146

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| FREDERICK PENNINGTON, III, individually, and on behalf of his minor child, C.P., <br><br> Plaintiff, <br><br> vs. <br><br> PROVIDENCE SEWARD MEDICAL CENTER and PROVIDENCE HEALTH & SERVICES, <br><br> Defendants. | Case No. _____ Civ ( _____ ) <br><br> **COMPLAINT FOR DAMAGES** |

For his complaint, Plaintiff, by and through counsel Power and Brown, LLC, alleges as follows:

**Parties and Jurisdiction**

1.  This action is a civil action where the matter in controversy exceeds the sum or

- 1 -

value of $75,000, exclusive of interest and costs, and is between citizens of different States, and jurisdiction arises under 28 U.S.C. § 1332(a)(1).

2. At the time of the conduct that forms the basis for the allegations in Plaintiff's Complaint, Plaintiff Frederick Pennington, III, was a resident of Grants Pass, Oregon. Mr. Pennington remains a resident of Grants Pass, Oregon and is the sole caretaker for his minor son, Plaintiff C.P., also a resident of Grants Pass, Oregon. C.P. suffers from cerebral palsy and is wheelchair bound.

3. Defendant Providence Seward Medical Center ("Seward") is a medical facility providing services in Seward, Alaska.

4. Defendant Providence Health & Services ("Providence") is a medical entity incorporated by the State of Alaska, providing services throughout Alaska, including Seward, Alaska through its Seward Medical Center. Its corporation headquarters is located in Anchorage, Alaska.

5. At all times relevant to this action, Dr. Michelle Hensel, nurse Nancy Fisher, nurse Phillip Wade and nurse Jane Doe were employed by Defendants and acted within the scope of their employment.

### Common Factual Allegations

6. On or about June 30, 2009, Plaintiff Frederick Pennington, III, ("Mr.

Pennington"), and his son, C.P. were vacationing in Seward, Alaska, with other family members and spent the day on a fishing charter operating as Crackerjack Charters.

7. After returning to their hotel later that day, Mr. Pennington experienced light-headedness and shortness of breath. Emergency medical providers were summoned and Mr. Pennington was transported by ambulance to the Seward emergency department. Because there was no one other than Mr. Pennington to attend to C.P., C.P. accompanied his father in the ambulance.

8. At approximately 11:00 P.M., Seward health care providers triaged Mr. Pennington. Even though Mr. Pennington provided his name and date of birth, Seward's employees misidentified Mr. Pennington as Frederick Pennington, Jr., Mr. Pennington's father. Frederick Pennington, Jr., suffers from chronic alcoholism and other related problems.

9. Mr. Pennington advised Seward's health care providers that earlier in the day he took his regular medications, including Effexor and a Serevent Disc, and Dramamine for sea sickness.

10. During triage, Mr. Pennington's vital signs revealed that both his blood pressure and heart rate were elevated.

11. Mr. Pennington did not sign Seward's Consent For Medical Treatment & Billing form. Even if he had signed the form, Mr. Pennington had a "right to refuse any proposed procedure(s) and/or treatment(s)."

12. C.P., seated in his wheelchair, was present in or just outside Mr. Pennington's emergency room at all times relevant to this action.

13. Seward nurses placed Mr. Pennington on oxygen and administered Xanax and Metoprolol to him, however, his blood pressure and heart rate remained elevated. An IV line was placed and intravenous fluids were started without incident.

14. Mr. Pennington's blood pressure and heart rate remained elevated. Due to his underlying condition and/or to the medications administered to him, he became verbally nonresponsive and could not make eye contact.

15. Concerned about the effects he was experiencing, Mr. Pennington repeatedly inquired about the medications administered to him by Seward.

16. At approximately 1:10 A.M. on July 1, 2009, Seward nurses administered Labetalol to Mr. Pennington but his blood pressure and heart rate remained elevated.

17. Concerned about the effects of the medications administered by Seward, Mr. Pennington stated that he wanted no further medications.

18. Seward did not seek emergency detention of Mr. Pennington under AS 47.30.705 or any other statute and thus, had no authority to hold Mr. Pennington at its facility and/or to administer medications to him against his will.

19. Even so, Seward confined Mr. Pennington to its emergency room, refused to allow him to leave his emergency room bed or its facility, and continued to inject him with medications against his will.

20. Mr. Pennington attempted to remove the IV line from his arm and implicitly revoked consent for further medications.

21. At approximately 2:00 A.M. on July 1, 2009, Seward requested police assistance from the Seward Police Department.

22. Officer James Rouleau responded to the call and upon his arrival was advised that a medical helicopter was enroute to transport Mr. Pennington to Providence in Anchorage.

23. Officer Rouleau entered Mr. Pennington's room and found Seward nurses attempting to replace an IV into Mr. Pennington's arm against Mr. Pennington's will.

24. When treating an agitated patient, emergency service personnel must use only the least restrictive method necessary to safely care for the patient. Even so, Officer Rouleau handcuffed Mr. Pennington's right wrist to his bedrail and further confined Mr. Pennington to Seward's emergency room.

25. At approximately 2:05 A.M., though Mr. Pennington refused further treatment, nurses restrained Mr. Pennington's left arm long enough to administer Ativan and a second dose of Labetalol.

26. Frightened and confused, Mr. Pennington repeatedly demonstrated by his conduct and words that he did not consent to further medications.

27. Even so, at approximately 2:25 A.M., Seward nurses attempted to place a new IV line for further medications. Mr. Pennington refused to cooperate with the

placement of the IV because he no longer consented to further medications. Officer Rouleau used physical force on Mr. Pennington to assist the nurses. As the nurses and officer applied physical force on Mr. Pennington, they caused serious injury to Mr. Pennington.

28. C.P., sitting in his wheelchair, witnessed these events and became emotionally distraught. Though unable to speak, he cried out repeatedly. Mr. Pennington, fearing for C.P.'s emotional well-being, requested that C.P. be taken from Mr. Pennington's room. Seward complied with this request.

29. Even though Mr. Pennington refused further medications, Officer Rouleau ordered Mr. Pennington to cooperate with the nursing staff and threatened to taser him.

30. A taser is designed to stop focused aggressors.

31. A taser is designed to protect others and not to coerce compliance.

32. A taser functions by sending an extremely painful electric pulse through the body of the victim.

33. A taser causes immobilization, disorientation, loss of balance, and weakness.

34. Tased individuals are rendered incapacitated, disoriented, and unable to move.

35. A taser should not be used against anyone unless the person demonstrates an overt intention to use violence or force against the officer or others and other alternatives for controlling them are not reasonable or available under the circumstances.

36. Even so, at approximately 3:14 A.M., with Mr. Pennington's right wrist

- 6 -

Case 3:10-cv-00191-TMB   Document 1   Filed 08/26/10   Page 6 of 12

handcuffed to a bedrail, Officer Rouleau deployed his taser into Mr. Pennington's chest administering five seconds of 50,000 volts into Mr. Pennington's body.

37. Though emergency personnel must always act as a patient's advocate, not one Seward staff member intervened on Mr. Pennington's behalf. No Seward staff member advised Officer Rouleau to cease tasering their patient.

38. Seconds later, when Mr. Pennington continued to refuse additional medication, Officer Rouleau administered another five second cycle of 50,000 volts into Mr. Pennington's body.

39. Again, no Seward staff member intervened on Mr. Pennington's behalf or advised Officer Rouleau to cease tasering their patient.

40. Mr. Pennington still did not want further medications, so at approximately 3:22 A.M., Officer Rouleau administered an additional one or two five second cycles of 50,000 volts into Mr. Pennington's body.

41. Again, no Seward staff member intervened on Mr. Pennington's behalf or advised Officer Rouleau to cease tasering their patient.

42. At approximately 3:40 A.M., a Lifemed crew arrived. By 4:05 A.M. Mr. Pennington was medically sedated and intubated without incident.

## Claims for Relief:
## Count I - Assault and Battery

43. Plaintiff incorporates all preceding paragraphs of this complaint.

44. Dr. Michelle Hensel, nurse Nancy Fisher, nurse Phillip Wade and nurse Jane Doe

acted intending to cause a harmful or offensive contact with Mr. Pennington.

45. Mr. Pennington was put in imminent apprehension of a harmful or offensive contact and a harmful or offensive contact resulted.

46. As a result of the conduct of Dr. Michelle Hensel, nurse Nancy Fisher, nurse Phillip Wade and nurse Jane Doe, Defendants are thereby liable for an assault and battery.

47. As a result of these actions, Mr. Pennington suffered both past and future medical expenses, rehabilitation expenses, physical injury, emotional distress, pain and suffering, inconvenience, loss of enjoyment of life, in an amount to be proven at trial, but in any event in excess of $75,000.

## **Count II – Medical Negligence**

48. Plaintiff incorporates all preceding paragraphs of this complaint.

49. The examination, care and control of the treatment of Mr. Pennington was performed by employees of Defendants. At all relevant times herein, said employees were acting within the scope of their employment.

50. In the aforesaid examination and control of the care and treatment of Mr. Pennington, Defendants' employees negligently failed to possess that degree of knowledge and skill ordinarily possessed and exercised at the time by other health care providers in the field or specialty in which they were practicing.

51. Defendants' employees negligently misidentified Mr. Pennington as Frederick

Pennington, Jr., and then, followed a treatment plan intended for Frederick Pennington, Jr., rather than Mr. Pennington.

52. Defendants' employees negligently provided medical treatment to Mr. Pennington without his written or verbal consent, against his will.

53. As a proximate result of the negligence of Defendants' employees and agents, Mr. Pennington suffered both past and future medical expenses, rehabilitation expenses, physical injury, emotional distress, pain and suffering, inconvenience, loss of enjoyment of life, in an amount to be proven at trial, but in any event in excess of $75,000.

## Count III – False Imprisonment

54. Plaintiff incorporates all preceding paragraphs of this complaint.

55. Defendants improperly interfered with Mr. Pennington's right to be free from confinement.

56. Defendants intentionally confined Mr. Pennington to his emergency room and when he tried to leave they forced him back onto his emergency room bed and confined him at their facility.

57. Mr. Pennington knew that Defendants prevented him from leaving the emergency room and was seriously harmed by the confinement.

58. Mr. Pennington did not consent, say anything or do anything to cause Defendants reasonably to believe he consented to being confined.

59. As a proximate result of the false imprisonment, Mr. Pennington suffered both past and future medical expenses, rehabilitation expenses, physical injury, emotional distress, pain and suffering, inconvenience, loss of enjoyment of life, in an amount to be proven at trial, but in any event in excess of $75,000.

## Count IV – Negligent Infliction of Emotional Distress

60. Plaintiff incorporates all preceding paragraphs of this complaint.

61. C.P. was present during Defendants' medical negligence and its approximately four-hour assault, battery, and false imprisonment of Mr. Pennington, and as a result, C.P. suffered severe emotional distress.

62. Defendants' conduct in its medical negligence and approximately four-hour assault, battery, and false imprisonment of Mr. Pennington was the cause of C.P.'s damages.

63. Defendants' actions proximately caused C.P. to suffer severe emotional distress which entitles C.P. to be compensated for his damages in an amount to be proven at trial, which shall include but not limited to past and future emotional distress, and past and future lost enjoyment of life; and such other damages as permitted by law.

## Count V - Vicarious Liability

64. Plaintiff incorporates all preceding paragraphs of this complaint.

65. The acts of Dr. Michelle Hensel, nurse Nancy Fisher, nurse Phillip Wade and nurse Jane Doe were within the scope of their employment and they were aided in accomplishing their acts by their positions with Defendants.

66. Further, their actions were based on their "motivation to serve" Defendants.

67. Defendants, as the employers of Dr. Michelle Hensel, nurse Nancy Fisher, nurse Phillip Wade and nurse Jane Doe, are vicariously liable for the intentional and negligent actions of their employees, as described herein.

68. As a result of the actions depicted above, Mr. Pennington suffered both past and future medical expenses, rehabilitation expenses, physical injury, emotional distress, pain and suffering, inconvenience, loss of enjoyment of life, in an amount to be proven at trial, but in any event in excess of $75,000, and C.P. suffered past and future emotional distress and lost enjoyment of life.

## Count VI - Punitive Damages

69. Plaintiff incorporates all preceding paragraphs of this complaint.

70. The actions of Defendants' employees were outrageous and taken with reckless disregard to the rights of Mr. Pennington and C.P.

71. As a result of the outrageous actions taken by Defendants' employees against Mr. Pennington and C.P., they are entitled to punitive damages from Defendants in an amount to be determined by the jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests the following relief:

1. Judgment against Defendants including compensatory damages in an amount as yet to be determined by the jury, but in any event greater than $75,000.00;

2. Judgment against Defendants for punitive damages;

3. Costs, interest, and attorney's fees incurred in bringing this action; and,

4. Such other relief as this Court may deem necessary and proper.

RESPECTFULLY SUBMITTED this 14th day of August, 2010, at Bethel, Alaska.

        s/ Michele L. Power
        P.O. Box 1809
        Bethel, Alaska 99559
        Phone: (907) 543-4700
        Fax: (888) 887-1146
        E-mail: admin@powerbrown.com
        ABA No. 9510047